**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

BEATRICE PRATT,                     )     CASE NO. 1:20cv1368
                                    )
                Plaintiff,          )
                                    )
        v.                          )     MAGISTRATE JUDGE
                                    )     JONATHAN D. GREENBERG
ANDREW SAUL,                        )
Commissioner of Social Security,    )
                                    )     **MEMORANDUM OF OPINION**
                Defendant.          )     **AND ORDER**
                                    )


Plaintiff, Beatrice Pratt ("Plaintiff" or "Pratt"), challenges the final decision of Defendant,

Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a

Period of Disability ("POD") and Supplemental Security Income ("SSI") under Titles II and XVI

of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. §

636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

## I.    PROCEDURAL HISTORY

On September 22, 2017, Pratt filed an application for POD and SSI alleging a disability onset date of December 29, 1999[2] and claiming she was disabled due to learning problems, depression, schizophrenia, and auditory hallucinations.[3] (Transcript ("Tr.") at 159, 179.)  The applications were denied initially and upon reconsideration, and Pratt requested a hearing before an administrative law judge ("ALJ").  (Tr. 129-31.)  On February 18, 2019, an ALJ held a hearing, during which Pratt, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 37-68.)  On April 12, 2019, the ALJ issued a written decision finding Pratt was not disabled.  (*Id*. at 31.)  The ALJ's decision became final on April 24, 2020, when the Appeals Council declined further review.  (*Id*. at 1-6.)

On June 22, 2020, Pratt filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 17, 19, 20.)  Pratt asserts the following assignments of error:

(1)    The ALJ committed harmful error when she erroneously failed to properly evaluate the evidence in this matter.

(2)    The ALJ erroneously failed to properly apply the doctrine of *res judicata*.

(3)    The ALJ committed harmful error when she failed to properly consider Plaintiff's need for a cane and how that would affect her ability to perform work at the medium level of exertion. She also committed harmful error when she failed to satisfy her burden at Step Five of the Sequential Evaluation.

---

[2]    The disability onset date is related to her prior claim, and was later amended to the application date, September 22, 2017.  (Tr. 19.)

[3]    Pratt noted elsewhere in her application that she has arthritis which prevented her from standing for long periods. (Tr. 179.)

2

(Doc. No. 17 at 1.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Pratt was born in 1965 and was a person closely approaching advanced age or of advanced age under social security regulations at all relevant times.  (Tr. 159.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has a limited education and is able to communicate in English.  (*Id.*)  She has no past relevant work.  (*Id*. at 30.)

### B.    Prior Application

On April 13, 2009, Dr. David House completed a psychological consultative examination of Pratt.  (Tr. 220-23.)  Dr. House diagnosed Pratt with major depression severe with psychotic features, PTSD, cocaine abuse in reported remission, nicotine dependence, and borderline intellectual functioning.  (*Id*. at 222.)  Dr. House opined that Pratt would be markedly limited in her ability to maintain attention and concentration, persistence and pace, her ability to withstand stress and pressure associated with day-to-day work, and her ability to relate to others.  (*Id*.)  In addition, she would be moderately limited in her ability to understand, remember, and follow instructions. (*Id*.)

On July 1, 2009, an ALJ issued a decision finding that Pratt was disabled as of November 11, 2008.  (*Id*. at 69-79.)  The finding of disability was based on the finding that her affective disorder satisfied the criteria of Listing 12.04.  (*Id*. at 78-9.)

Pratt's social security benefits were terminated as a result of incarceration.

3

**C.  Relevant Medical Evidence[4]**

**1.  Mental Impairments**

While incarcerated, Pratt was noted to have schizoaffective disorder, depressive type and a lump in her breast. (*Id*. at 229-74.)  While participating in mental health treatment, it was observed that she had short term and long-term memory problems.  (*Id*. at 241.)

In  January 2017, Pratt was released from prison and referred to the CARES Program.  (*Id*. at 355.)

In February 2017, Pratt began treatment at Murtis Taylor.  (*Id*. at 306-11). At that time, she appeared unkempt, with average demeanor and clear speech.  (*Id*. at 310.)  She was assessed as needing "mild" care.  (*Id*.)

From March 2017 through October 2017, Pratt received medication management services at Murtis Taylor.  (*Id*. at 312-337). The treatment diagnoses were paranoid schizophrenia and alcohol use disorder moderate.  (*Id*. at 320.)

On May 11, 2017, Pratt attended a psychological consultative examination with Dr. Jorethia Chuck. (*Id*. at 289-94.)  Pratt reported that she had Schizophrenia and that she still drank about 12 beers a day.  (*Id*. at 289-90.)  She said she did not socialize, although she had a good relationship with close family members.  (*Id*.)  Pratt reported that she had recently started taking medications, which helped; she no longer heard voices or saw shadows, but she was still depressed, with little energy and reported episodes of self-isolation.  (*Id*. at 291.)  Pratt reported that she could not handle money, but her daily activities included maintaining self-care, doing chores like cooking and

---

[4] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

4

laundry, shopping and using public transportation. (*Id*.) On examination, Dr. Chuck noted problems with recall and cognition, but otherwise normal and cooperative behavior, as well as normal speech, thoughts, mood, affect, orientation and concentration. (*Id*. at 291-92.)  During testing, Pratt was unable to recite any of the three objects after five minutes. (*Id*. at 292.)  Her cognitive functioning measured in the extremely low range and her general fund of information appeared limited. (*Id.*) Dr. Chuck diagnosed Pratt with major depressive disorder recurrent moderate and alcohol use disorder moderate in early remission. (*Id*.)  Dr. Chuck concluded that Pratt had significant symptoms of depression and anxiety which appeared to interfere with her functioning. (*Id*. at 293.) Dr. Chuck opined that Pratt had limitations in the area of understanding, remembering, and carrying out instructions; she displayed some difficulties with concentration; she would have difficulty maintaining persistence and pace to perform tasks; could get along with others; and she would likely deteriorate under the pressures of a normal work setting. (*Id*. at 293-94.)

On September 26, 2017, Pratt saw Nurse Practitioner Shadina Terry at Murtis Taylor for medication management, and reported she was living in a sober home. (*Id*. at 330-31.)  Although she complained that she was not sleeping well, she denied depression and racing thoughts. (*Id*. at 331.)  On examination, she showed limited judgment and insight, but normal mood, affect, thought process and thought content, and no hallucinations or delusions. (*Id*.)  Nurse Terry added melatonin to Pratt's medications to help with her sleep problems. (*Id*.)

On October 23, 2017, Pratt returned to see Nurse Terry and reported the melatonin was effective, and Pratt's sleep was "good." (*Id*. at 574.)  On examination, Pratt reported some "persecutory" delusions, but all other findings were normal including mood, affect, speech, thought

process, thought content, judgment and insight.  (*Id*.)  Nurse Terry noted Pratt rocked back and forth while talking, and reported this was "comforting."  (*Id.*)

On November 20, 2017, Pratt had a medication management appointment with Nurse Terry. (*Id*. at 563-71.)  She reported being sober for six months, and continued to experience anger and depression problems.  (*Id.* at 565.)  On examination, she was "pleasant and cooperative and [did] not snap at people."  (*Id*.)  Nurse Terry noted Pratt had "limited" insight and judgment, but normal appearance, speech, mood, affect and thoughts (including no delusions or hallucinations).  (*Id.*)

On December 18, 2017, Pratt returned to see Nurse Terry for medication management. (Tr. 549-51.)  She reported having spent three days in the hospital for pneumonia, and was still taking antibiotics.  (*Id*. at 549.)  She reported no positive or negative symptoms, was compliant with medication, and isolated herself at the sober living residence because she didn't trust people in the house, although she did participate in the treatment programs.  (*Id.* at 551.)

On February 19, 2018, Pratt returned to see Nurse Terry for medication management.  (*Id*. at 531-48.)  She reported feeling stable, had been off drugs for the last ten months, and "denie[d] mood swings, depression, paranoia and sleep disturbance."  (*Id*. at 532.)  She had normal mental status findings, with the exception of "loud" speech.  (*Id*. at 544.)

On January 21, 2019 Terry completed a Mental Impairment Questionnaire, and opined that, based on Pratt's paranoid schizophrenia with related mood dysregulation and paranoia, Pratt would be unable to meet competitive standards with the following work attributes:

- manage regular attendance and be punctual within customary tolerances,

- sustain an ordinary routine without special supervision,

- work in coordination with or in proximity to others without being distracted by them,

- complete a normal workday or workweek without interruptions from psychologically-based symptoms,

- understand and remember very short and simple instructions,

- get along with coworkers or peers without distracting them or exhibiting behavioral extremes,

- respond appropriately to changes in the work setting,

- be aware of normal hazards and take appropriate precautions, and

- set realistic goals or make plans independently of others.

(*Id*. at 448-49.)  In addition, Terry opined Pratt would have no useful ability to function with remembering locations and work-like procedures or understanding and remembering detailed instructions.  (*Id*.)

### 2.    Physical Impairments

On November 1, 2017, Dr. Dorothy Bradford performed a physical consultative examination of Pratt.  (Tr. 364-71). Other than some limited range of motion in the lower back, Pratt had normal physical examination findings, including strength, reflexes, range of motion and gait.  (*Id*. at 364-67, 371).  An x-ray of Pratt's lumbar spine showed mild arthritis.  (*Id*. at 368.)  Dr. Bradford opined that Pratt had "no activity restrictions."  (*Id*. at 371.)

On November 22, 2017, Pratt saw orthopedist Dr. Robert Nickodern at the Cleveland Clinic for an evaluation of her right knee, which had been in pain for the past four months, following two falls.  (*Id*. at 434-38, 440-41.)  She reported her knee bothered her the most when she climbed stairs.  (*Id*. at 435.)  After examining her and doing x-rays, Dr. Nickodern recommended weight loss, physical therapy and Meloxicam.  (*Id*. at 436.)  He opined Pratt could do "activity as tolerated" and "follow-up on an as-needed basis."  (*Id*.)

On December 4, 2017, Pratt established care with Dr. Marina Marcu.  (*Id*. at 405-8.)  Her diagnoses were primary osteoarthritis of right knee, acute pain of right knee, essential hypertension, and class 2 severe obesity.  (*Id*. at 407.)

On March 21, 2018, Pratt saw her primary care physician, Dr. Donald Eghobamien, and reported she experienced pain "all over" her joints, including her hands, legs and neck.  (*Id*. at 597.)

On September 5, 2018, Pratt returned to Dr. Eghobamien for treatment of her joint pain, as well as a sore throat and vision issues.  (*Id*. at 591.)

On December 9, 2018, Pratt sought treatment at the emergency room at St. Vincent Charity Hospital for shortness of breath.  (*Id*. at 377.)  The clinical impression was asthma attacks lasting more than 24 hours.  (*Id*. at 383.)

On February 1, 2019, Pratt returned to Dr. Eghobamien, and reported continuing joint pains.  (*Id*. at 589.)  He considered a diagnosis of fibromyalgia, and prescribed Gabapentin.  (*Id*. at 590.)

**D.    State Agency Reports**

**1.    Mental Impairments**

On October 18, 2017, State Agency reviewing psychologist Bruce Goldsmith, Ph.D. opined that Pratt had moderate limitations in each of the "B" criteria.  (*Id*. at 87.)  He further opined that Pratt would have moderate limitations with the following:

- ability to understand and remember detailed instructions,

- ability to carry out detailed instructions,

- ability to maintain attention and concentration for extended periods,

- ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms,

8

- ability to perform at a consistent pace without an unreasonable number and length of rest periods,

- ability to interact appropriately with the general public,

- ability to accept instructions and respond appropriately to criticism from supervisors,

- ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and

- ability to respond appropriately to changes in the work setting.

(*Id*. at 91-3.)

On December 31, 2017, State Agency reviewing psychiatrist Kathleen Malloy Ph.D. reviewed the record and concurred with Dr. Goldsmith's opinion.  (*Id*. at 108-10.)

### 2.    Physical Impairments

On November 7, 2017, State Agency reviewing physician Dr. Diane Manos reviewed the file and opined that Pratt was limited to the medium level of exertion, but could only frequently stoop and climb ladders, ropes or scaffolds.  (Tr. 89-91.)

On December 31, 2017, State Agency reviewing physician Dr. Steve McKee reviewed the record and concurred with Dr. Manos' opinion, but added limitations to frequent kneeling, crouching and crawling.  (*Id*. at 106-8.)

### E.    Hearing Testimony

During the February 19, 2019 hearing, Pratt testified to the following:

- She lives in a building for people who have been in prison recovery, but has her own unit.  (Tr. 41.)

- She does not have a driver's license, and took the bus to her hearing.  (*Id.*)

- She completed seventh grade, and has difficulty with reading and writing.  (*Id.*)

9

- She used to smoke, but stopped on December 8, 2017.  (*Id*. at 42.)

- The last time she used any alcohol or drugs was May 15, 2017.  (*Id*.)

- She prepares her own food using the microwave or eats cereal.  She doesn't know how to cook.  She does dishes and does her own laundry.  Her sister takes her grocery shopping.  (*Id*.)

- She sometimes watches television, but finds it depressing.  She tries to occupy her mind with collages.  Her building has meetings that she tires to participate in, but otherwise she doesn't belong to any organizations or groups.  (*Id*. at 43.)

- She sees her family "every now and then."  She talks to them on the phone.  (*Id*.)

- On a typical day, she might go to an AA meeting or the library.  Often, she likes to isolate in her room.  She sometimes naps during the day or talks to her family on the phone.  She leaves her building to go to doctor's appointments or see her case worker.  (*Id*. at 44.)

- She has no friends, and doesn't hang out with people.  (*Id*. at 44-5.)

- She participated in job training through Vocational Guidance Services, but found it hard, because of her memory problems and because there's lots of stuff she can't do, and was never placed in a job.  (*Id*. at 45.)

- She is disabled by her anxiety and depression.  She can't stand for a long time.  She has short term memory loss.  She has trouble lifting things and her knees go out because of her arthritis.  (*Id*. at 46.)

- She did not receive any physical therapy or treatment for her knees and hand while in prison.  (*Id*. at 45-6.)

- She currently gets pills for her pain, but not physical therapy or injections.  She talks to her doctor at Murtis Taylor, and has a support group sponsor, and shares what she is feeling all the time.  (*Id*. at 47.)

- She does not experience side effects from her medications.  (*Id*. at 48.)

- She has been using a cane for about three months.  Her doctor gave it to her.  (*Id.*)

- She can lift and carry ten or fifteen pounds, or maybe more if she uses two hands.  Lifting causes pain in her right shoulder, but she is not getting treatment for it.  (*Id*. at 48-9.)

10

- She can stand for about twenty minutes or better.  She can walk for ten or fifteen minutes before she gets out of breath, her heart rate goes up, and she has to sit down for about ten minutes.  (*Id*. at 49.)

- She is right handed, but sometimes uses her left hand because her hands get sore.  She sometimes has sharp pain in her right shoulder when she reaches in front of her or over her head.  She can write for a little while.  (*Id*. at 49-50.)

- She can go up and down stairs, but it takes a minute.  She can't kneel, and crawling hurts her knees.  (*Id*. at 50.)

- Sometimes being around large groups of people causes a panic attack.  Her heart beats really fast, she sweats, she's nervous.  But she was in the general population in prison.  (*Id*. at 50-1.)

- Sometimes she has trouble remembering things, like doctor's appointments.  (*Id*. at 51.)

- She needed to use an inhaler during the hearing because too much talking caused her shortness of breath.  She has two inhalers, and uses them as often as every thirty minutes, but is supposed to use them twice a day.  Chemicals and fumes also irritate her.  (*Id*. at 51-2.)

- Her apartment is one room, and she stays there because sometimes she feels like people are talking about her, and other times she forgets.  (*Id*. at 52-3.)

- Her sister takes her shopping because she doesn't know how to do it herself.  She doesn't know how to plan meals or cook.  She eats a lot of cereal and milk and frozen tv dinners.  She also has trouble paying because she doesn't like to count change.  She uses a debit card to pay.  (*Id*. at 53-5.)

- Sometimes she has trouble sleeping, and nightmares.  (*Id*. at 58-9.)

The VE testified Pratt had no past relevant work.  (*Id*. at 60.)  The ALJ then posed the following hypothetical question:

> So let's assume a hypothetical person of the same age and education as Ms. Pratt. If this person could perform at the medium exertional level except that they were only frequently climbing stairs and ramps and no ladders, ropes, or scaffolds; and they could frequently balance, stoop, kneel, crouch, and crawl. They would not be exposed to extreme temperatures or concentrated levels of pulmonary irritants such as fumes, dust, odors, gases. This person could perform simple, routine tasks with simple, short instructions; make simple decisions; have few workplace changes with

11

> no fast-paced production quota requirements; occasional and superficial interaction with coworkers, supervisors, and the public. Superficial refers to the ability to ask and answer simple questions, give and follow simple direction. The person can understand and    and incorporate simple correction or criticism. But this person would not be required to read instructions, write reports, or perform math calculations.

(*Id*. at 60.)

The VE testified the hypothetical individual would be able to perform unskilled jobs in the economy, such as kitchen helper, laundry laborer, or hand packager.  (*Id*. at 61.)

The ALJ amended the hypothetical to add the limitation that the person would be off task at least 20% of the time.  (*Id*.)  The VE opined that this would preclude any competitive work if it is an ongoing problem. (*Id*.)

The ALJ then asked whether a person needing a cane could perform work at the medium or light level of exertion.  (*Id*.)  The VE testified they could not.  (*Id*.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity"

12

at the time of the disability application.  20 C.F.R. §§ 404.1520(b) & 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) & 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since September 22, 2017, the application date.

2.    The claimant has the following severe impairments: asthma and/or chronic obstructive pulmonary disease (COPD), obesity, paranoid schizophrenia, and borderline intellectual functioning.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

13

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except she can frequently climb stairs and ramps; no climbing of ladders, ropes or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; no exposure to extreme temperatures or concentrated levels of pulmonary irritants fumes, dusts, odors, or gases; can perform simple, routine tasks with simple short instructions, make simple decisions, have few workplace changes, with no fast production quota requirements; occasional and superficial interaction with coworkers, supervisors, and the public; and no reading of instructions, writing reports, or performing math calculations.

5.      The claimant has no past relevant work.

6.      The claimant was born on **, 1965 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed.

7.      The claimant has a limited education wad was able to communicate in English.

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.     The claimant has not been under a disability, as defined in the Social Security Act, since September 22, 2017, the date the application was filed.

(Tr. 19-31) (internal citations omitted).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572

F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence,

15

however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10 cv 734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09 cv 1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.  First Assignment of Error: Evaluation of the Evidence

Pratt asserts that the ALJ erred in her evaluation of the opinion evidence[5] relating to the severity of her mental impairments and did not support her finding with substantial evidence. (Doc. No. 17 at 10, 13.) She also argues that the ALJ erred in finding her degenerative joint disease and back issues were non-severe, because she failed to explain her reasoning and did not properly

---

[5]     Pratt questions the ALJ's treatment of opinion evidence from the relevant periods of both the current application and her prior application.  Because Dr. House's consultative examination was performed in 2009, in connection to her prior application, it is properly considered in section VI.B, which deals with the application of the doctrine of *res judicata*.

consider her obesity in combination with other physical impairments, as required by SSR 02-1p. (*Id.* at 10, 13-14.)

The Commissioner responds that substantial evidence supports the ALJ's RFC determination for both Pratt's mental and physical impairments.  (Doc. No. 19 at 8.)  He asserts that Pratt's assertion that the ALJ failed to explain her reasoning "entirely ignores" the numerous pieces of specific evidence cited by the ALJ in support of that finding, "including the consultative examination, the findings of the state agency physicians, the objective evidence (like the physical examinations and imaging studies) and plaintiff's limited treatment."  (*Id.* at 10.)  He also argues that any argument challenging the ALJ's physical RFC determination must fail because Pratt failed to point to any evidence supporting a more limited physical RFC.  (*Id.*)  He asserts that Pratt similarly fails to acknowledge the evidence the ALJ relied on to support her determination of Pratt's mental RFC.  (*Id.* at 10-11.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(c), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially

17

when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F.Supp. 2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96 8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, at step two, the ALJ determined Pratt suffered from the severe impairments of asthma and/or COPD, obesity, paranoid schizophrenia, and borderline intellectual functioning.  (Tr. 19.) The ALJ found Pratt's "mild" degenerative joint disease of the right knee, "very mild" scoliosis and "mild" arthritis of the lumbar spine, hypertension, and alcohol use disorder in remission for almost two years were non-severe impairments.  (*Id.*)

After determining Pratt's impairments did not meet or equal the requirements of a Listing, the ALJ proceeded, at step four, to consider Pratt's allegations regarding both her mental and physical limitations.[6]  (Tr. 22-9.)

---

[6]  Pratt argues that ALJ's finding that she had only moderate limitations in the paragraph B criteria was an error, as the 2009 decision found that her affective disorder satisfied the criteria of Listing 12.04. (Doc. No. 17 at 13, citing Tr. 78-9.) However, as explained below, the ALJ properly assessed the evidence *de novo*, and cited substantial evidence in support of her determination.

18

i.      **Physical RFC**

The ALJ found that Pratt had the physical RFC to perform medium work as defined in 20

CFR 416.967(c) with the following additional limitations:

> she can frequently climb stairs and ramps; no climbing of ladders, ropes or
> scaffolds; frequently balance, stoop, kneel, crouch, and crawl; no exposure to
> extreme temperatures or concentrated levels of pulmonary irritants fumes, dusts,
> odors, or gases.

(Tr. 22.)  The ALJ based this determination on record evidence including:

- The November 1, 2017, report of consultative examining physician Dr. Bradford,
  which included normal physical examination findings, other than some range of
  motion limitation in the lumbar spine.  Dr. Bradford opined that Pratt had "no
  activity restrictions."  (*Id.* at 25-26, citing Tr. 364-71.)

- The opinions of the State Agency reviewing physicians, who both concluded that
  Pratt could do a range of medium work  (*Id.* at 28, citing Tr. 89-91, 106-08.)

- X-rays of Pratt's right knee and low back, which showed only "mild" or "slight"
  abnormalities (*Id.* at  25-26, citing Tr. 302, 436.)

- The "sparse course of treatment," including Pratt's decision to treat solely with
  medications and not pursue physical therapy.  (*Id.* at 26-7.)

The ALJ also explicitly considered Pratt's obesity, explaining:

> As recounted above, the imaging of the claimant's lumbar spine and right knee
> contain mild findings.  While the claimant is obese, the physical examinations are
> normal and unremarkable.  The claimant did not pursue physical therapy, and she
> treats with medications.  While the claimant receives medical care on a regular
> basis, she has not required or received frequent medical care for any condition.
> From all this, the undersigned finds that the claimant's symptoms and limitations
> are not as severe as alleged.

(*Id.* at 27.)

First, Pratt asserts that the ALJ erred by finding that the "problems with her right knee" and

"back issues" were not severe impairments.  (Doc. No. 17 at 13.)  However, while she cites medical

record evidence that she has primary osteoarthritis and degenerative changes in her right knee and

19

arthritis in her lumbar spine, none of this evidence characterizes these impairments as more than "mild," and no medical opinion evidence supports the conclusion that these issues cause functional impairments.  (*Id*. at 13-14.)  Pratt appears to implicitly acknowledge this by shifting her argument to contend that the ALJ should have found that these impairments in combination with her obesity, history of substance abuse, and schizophrenia, "precluded her from performing work at the medium level of exertion."  (*Id*. at 14-15.)

The Sixth Circuit has recognized that an ALJ must "consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Nejat v. Comm'r of Soc. Sec*., 359 F. App'x 574, 577 (6th Cir. 2009).  SSR 02 1p acknowledges that "[o]besity is a complex, chronic disease characterized by excessive accumulation of body fat." SSR 02 1p, 2002 WL 34686281, at *2.  Therefore, it must be considered throughout the ALJ's determinations, "including when assessing an individual's residual functional capacity," because "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." SSR 02 1p, 2002 WL 34686281, at *1.  Further, SSR 02 1p directs that the ALJ "will explain how [he] reached [his] conclusions on whether obesity caused any physical or mental limitations."  SSR 02-1p at *6.  The regulation "does not identify a specific method of analysis," but does provide "detailed interpretive guidelines." *Norman v. Astrue*, 694 F. Supp. 2d 738, 748-49 (N.D. Ohio 2010), *citing Bledsoe v. Barnhart*, 165 F. App'x 408, 411 12 (6th Cir. 2006).

Here, the ALJ explained that she used record evidence including physical examination reports and the conservative course of treatment to support her assessment of the impact of obesity of Pratt's RFC.  In her RFC, the ALJ limited Pratt to frequently climbing stairs and ramps; no

climbing of ladders, ropes or scaffolds; and frequently balancing, stooping, kneeling, crouching, and crawling.  (Tr. 22.)  These limitations accommodate the combined impact of her degenerative joint disease of the right knee, arthritis and obesity, demonstrating that the ALJ considered the combined impact of these impairments on Pratt's functional abilities despite designating some of them as "non-severe."  (Tr. 22.)

The ALJ's assessment meets the standard of minimal articulation of an assessment of the evidence. *See Morris v. Sec'y of H.H.S.*, No. 86 5875, 1988 WL 34109 (E.D. Tenn. Apr. 18, 1988), at *2 ("a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position.")  The ALJ's decision makes it clear that she expressly considered Pratt's obesity as a factor in her disability, and provides substantial evidence in support of her physical RFC determination. For these reasons, this Court finds that the ALJ considered Pratt's obesity and the effect of her cumulative impairments as required by the regulations, and sufficiently explained her reasoning in determining Pratt's physical RFC.

### ii.     Mental RFC

The ALJ found that Pratt had the following limitations to her mental RFC:

> can perform simple, routine tasks with simple short instructions, make simple decisions, have few workplace changes, with no fast production quota requirements; occasional and superficial interaction with coworkers, supervisors, and the public; and no reading of instructions, writing reports, or performing math calculations.

(Tr. 22.)

Pratt argues that this RFC determination failed to sufficiently accommodate the State Agency reviewing physician's opinion that she "could not interact with the general public."  (Doc.

No. 17 at 16, citing Tr. 93, 110.)  She also asserts that it does not sufficiently incorporate the opinion of psychological consultative examiner Dr. Chuck, who opined that Pratt showed "limitations in understanding, remembering, and carrying out instructions, difficulty maintaining persistence and pace to perform tasks, and her ability to respond appropriately to work pressures would likely deteriorate under the pressures of a normal work setting."[7] (*Id.*, citing Tr. 293-94.)

The ALJ explained that she based her mental RFC determination on the opinion evidence cited above, as well as Pratt's "mental status examinations and course of treatment."  (*Id.* at 27.) Pratt's mental status examinations generally showed normal mood, affect, speech, thought process, thought content, judgment and insight.  (*Id*. at 331, 488-89, 508, 544, 565, 574.)  The ALJ noted Pratt's course of treatment was conservative, consisting primarily of medication management, with no psychiatric hospitalizations or intensive outpatient mental health services.  (*Id*. at 27.)  As the Sixth Circuit has explained, an ALJ can rely on conservative mental health treatment to discount a treating doctor's opinion, and therefore such evidence can also properly be used to weigh the opinions of non-treating sources.  *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 808-09 (6th Cir. 2012).   The ALJ also explained that she considered it significant that "once she engaged in treatment, the record clearly shows that the claimant's symptoms improved with medications and continued sobriety."  (*Id*. at 28.)

In making a determination of RFC, ALJs "are not required to adopt any prior administrative medical findings."  20 C.F.R. §416.913(a).  Nonetheless, the ALJ must consider all of the medical

---

[7]     The Court deems additional arguments regarding the treatment of Nurse Terry's opinion are undeveloped, and therefore waived.  *See U.S. v. Catlan*, 499 F.3d 604, 606 (6th Cir. 2007) ("We require parties to develop their arguments in a non-perfunctory manner at the risk of having them deemed waived."); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (same).

opinions contained in the record "together with the rest of the relevant evidence." 20 C.F.R. §416.927(b), (c). The ALJ is charged with weighing medical opinions based on the following factors: 1) examining relationship, 2) treatment relationship, 3) supportability, 4) consistency with the record, 5) specialization of the source, 6) other factors, such as understanding the disability programs and knowledge of the other information in the case record. *See* 20 C.F.R. §416.927(c)(1)-(6). The ALJ is not required to articulate specific findings as to each of these factors, however. Neither the regulations or Sixth Circuit case law requires an "exhaustive factor-by factor analysis." *Francis v. Comm'r Soc. Sec.,* 414 F. App'x 802, 804 (6th Cir. 2011).

Here, the ALJ thoroughly recounted the medical evidence regarding Pratt's mental impairments. (Tr. 19-22.) Then, she explained her treatment of Dr. Chuck's opinion as follows:

> Dr. Chuck's medical opinion is persuasive because she supported it with an explanation and with her own observations. However, the undersigned finds that the opinion is more consistent with the claimant's behavior at the time of the evaluation [May 11, 2017], but the claimant testified that she was not sober until May 15, 2017. Further, in September 2017, the claimant successfully completed a CD program. The claimant testified that she lives alone in an apartment; she attends AA meetings and has been sober sine May 15, 2017; and she came to the hearing by bus. The medical evidence of record shows that the claimant has been compliant with her appointments at Murtis Taylor and with her medications. In light of this evidence, Dr. Chuck's opinion is now less persuasive.

(*Id.* at 24.) The ALJ identified substantial evidence supporting her decision to adopt only some of the accommodations recommended in Dr. Chuck's opinion, and properly considered the opinion in light of the entire record.

The ALJ addressed the State Agency reviewing psychologists' opinions as follows:

> Bruce Goldsmith, Ph.D., and Kathleen Malloy, Ph.D., reviewed the claimant's case file at the request of the State agency, the Division of Disability Determination Services, on October 18, 2017, and February 1, 2018, respectively. Both consultants made the following medical finding: the claimant is limited to simple task instructions; is limited to simple tasks that are not fast paced or have

unusual production demands; retains the ability to interact on a superficial level with coworkers and supervisors, but does not have the patience for service with the general public; and she is able to adapt to infrequent minor changes in routine.

These medical findings are persuasive because they are supported by the mental status examinations and course of treatment. However, the undersigned has reworded it for conciseness and using more concise terms. Due to her borderline intellectual functioning, the undersigned added the limitation of no reading of instructions, writing reports, or performing math calculations.

(Tr. 28-9) (internal citation omitted).

Although the ALJ's rephrasing of the State Agency reviewing psychologists' opined limitation that Pratt "does not have the patience for service with the general public" as a limitation to "occasional and superficial interaction with . . . the public" initially seems inconsistent, it is consistent with the assertion that Pratt's ability to interact with the generally public is "Moderately limited," which is expressed in both opinions. (Tr. 92, 109.) Further, none of the representative jobs identified by the VE - kitchen helper, laundry laborer, or hand packager - involve significant interaction with the general public.[8] (*Id*. at 61.) Therefore, Pratt fails to demonstrate that the ALJ's rephrasing of the limitation significantly impacted the finding of disability.

Although Pratt identifies evidence which could support more restrictive physical and mental functional limitations, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001). Indeed, the Sixth Circuit has made clear that an ALJ's

---

[8]     The Dictionary of Occupational Titles (DOT) states that contact with people is "Not Significant" in these jobs. *See* DOT §§ 317.684-010 (available at 1991 WL 672750), 361.685-018 (available at 1991 WL 672987), 920.586-010 (available at 1991 WL 687913); see also SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985) (unskilled jobs "ordinarily involve dealing primarily with objects, rather than with data or people").

24

decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Here, the ALJ provided sufficiently specific reasons for both her RFC determinations, and these reasons are supported by substantial evidence in the record.

For all the reasons set forth above, the Court finds the ALJ did not err in her evaluation of the opinion evidence regarding Pratt's mental impairments, and properly supported her determination of Pratt's physical and mental RFC with substantial evidence. Accordingly, this assignment of error is without merit.

**B.      Second Assignment of Error: Doctrine of *Res Judicata***

Pratt asserts that the ALJ erred by failing to apply the doctrine of *res judicata* to the July 1, 2009 finding of disability, which found Pratt's mental impairments met the criteria of Listing 12.04. (Doc. No. 17 at 19.) She notes that her benefits were not terminated due to medical improvement, but due to her incarceration. (*Id.* at 20.) She acknowledges that she received counseling and medication while incarcerated, but asserts the medical record evidence does not document significant improvement. (*Id.*)

The Commissioner responds that the ALJ properly conducted a *de novo* review of the case based on a "change in the law" as well as "new and material evidence establishing a significant improvement in the claimant's mental condition." (Doc. No. 19 at 20-1.)

In *Drummond v. Commissioner of Social Security*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997) (relying on *Senters v. Sec'y of Health &*

25

*Human Servs.*, No. 91 5966, 1992 WL 78102 (6th Cir. Apr. 17, 1991) (per curiam). *See also Blankenship v. Comm'r of Soc. Sec.*, 624 F. App'x 419, 425 (6th Cir. Aug. 26, 2015).  In response, the Commissioner issued AR 98-4(6), which bound ALJs deciding a second disability claim to the prior ALJ's findings "unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding." 1998 WL 283902, at *3.  The Sixth Circuit clarified the scope of *Drummond* in *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. June 27, 2018).  *Earley* made clear that new regulatory framework for determining disability is a changed circumstance justifying departure from a prior ALJ's ruling, and explicitly stated that because "human health is rarely static. . . . Any earlier proceeding that found or rejected the onset of a disability could rarely, if ever, have 'actually litigated and resolved' whether a person was disabled at some later date." *Earley,* 893 F.3d at 932-33.  Here, Pratt's 2009 award of disability benefits rests on a regulatory framework that is no longer in effect.  Additionally her claim that the second application "dealt with the same type of benefits and the same period of time" because she claimed her disability began in December of 1999 is clearly barred by *Earley*, which explained "If an individual, say, files a second application for the same period of time finally rejected by the first application and offers no cognizable explanation for revisiting the first decision, *res judicata* would bar the second application."  *Earley,* 893 F.3d at 933. Thus, if *res judicata* applies at all, it would do so only to limit the temporal scope of Pratt's claim.[9]

---

[9]    Further, the Court notes that Social Security regulations, cited by neither party, establish a "suspend then terminate" procedure for individuals incarcerated in public institutions.  Pursuant to 20 C.F.R. § 416.1325(a), an SSI recipient's benefits are suspended for the first 12 months they reside in a public institution. If the recipient's incarceration continues beyond 12 months, 20 C.F.R. § 416.1335 provides for benefits to be terminated.   After release from incarceration, a recipient whose benefits were terminated under 20 C.F.R. § 416.1335 must file a

The Sixth Circuit's guidance in *Earley* makes clear that *res judicata* cannot properly be applied to this case, as it covers a different time period than Pratt's prior application. Pratt's present claim is that she was disabled when she filed her application in 2017, an issue the ALJ in 2009 could not have considered. Thus, the ALJ properly conducted a *de novo* review of the record. Nor does Pratt argue that the ALJ ignored the first administrative law judge's findings. The ALJ explicitly considered the evidence of the earlier application, and explained she was not bound by *res judicata* because "there has been a change in the law, regulations, or rulings affecting the findings or the method for arriving at the finding. In particular, there were new regulations for evaluating mental disorders, effective January 17, 2017. Furthermore, there is new and material evidence establishing a significant improvement in the claimant's mental condition." (Tr. 16.)

Sixth Circuit precedent makes clear an ALJ has a "zone of choice" within which their decisions are not subject to judicial interference. *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). Findings of disability from prior periods can provide substantial evidence for an ALJ to make the same finding again, but cannot bind the ALJ. *Earley*, 893 F.3d at 933. Although the 2009 decision provides substantial evidence supporting Pratt's preferred conclusion, it does not warrant remanding the decision here, which is also supported by substantial evidence.

---

new SSI application upon her release from prison. *Blair v. Comm'r of Soc. Sec. Admin.*, No. 3:18-CV-00018, 2019 WL 4737619, at *3 (S.D. Ohio Sept. 27, 2019). It is not proper to reopen an application that has been suspended for more than 12 months, which is the implication of Pratt's assertion that her second application should have been considered "under the same Title" as the first (Doc. No. 17 at 21.)

### C.      Third Assignment of Error: Need for a Cane

Pratt also asserts that the ALJ erred by failing to include the use of a cane in her RFC. (Doc. No. 17 at 21.)  She notes that she attended the hearing using a cane, and testified that she had used a cane for the past three months.  (*Id.*)  She argues the ALJ's hypothetical to the VE was incomplete because it did not include the limitation of use of a cane, and this omission constituted harmful error.

The ALJ addressed Pratt's use of a cane as follows:

> The claimant testified that she had used a cane for the past three months and it was prescribed by her doctor.  However, a review of the record failed to show that any medical provider ordered or prescribed a cane for the claimant.  Furthermore, the record does not support the medical necessity for a cane.  On January 22, 2019, Ms. Terry noted the claimant arrived with her cane and complained of left side, left knee pain.  Ms. Terry documented the claimant walked with a cane and had a "slight limp."  Despite this notation, a review of the record failed to show that any medical provider ordered or prescribed a cane for the claimant and the record does not support the medical necessity for a cane.

(Tr. 27) (internal citations omitted).

Social Security Ruling 96  9p addresses the use of an assistive device in determining RFC and the vocational implications of such devices:

> **Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96  9p, 1996 WL 374185, *7 (S.S.A. July 2, 1996).

28

As other courts in this district have explained, a plaintiff's own testimony cannot, alone, establish medical necessity for a cane.  *See, e.g., Wright v. Berryhill*, No. 18-1724, 2019 WL 5802334, at *9 (N.D. Ohio July 1, 2019) ("Plaintiff's own hearing testimony does not qualify as medical documentation and is insufficient to establish that her cane usage was medically required"). Nor does Nurse Terry's notation that Pratt was observed using a cane provide the necessary documentation, especially given that her notes indicate that Pratt was using the cane to compensate for left knee pain, when elsewhere the record indicates that Pratt's right knee had permanent degenerative impairment.[10]

Because Pratt failed to establish the necessity for a cane, the ALJ was not required to include it in the RFC or the hypothetical she posed to the VE.  *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996) ("the ALJ was not required to assume that all of [Plaintiff's] testimony was credible in questioning the VE.")  Therefore, this assignment of error is without merit.

### VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

 *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: June 8, 2021

---

[10]    Pratt also cites notes which state that Nurse Terry observed Pratt "walked with a slight limp," and "reports SOB when walking," but these do not mention use of a cane at all. (Doc. No. 20 at 4, citing Tr. 488, 508.)

29